Case number 20-5096, United States of America v. Dwayne Sheckles. Arguments not to exceed 15 minutes per side. Mr. Shad, you may proceed for the appellant. Good morning, your honors, and may it please the court, I'm here this morning representing Dwayne Sheckles, and I'd like to reserve three minutes for rebuttal if I may. Great. Thank you. So, your honors, I've raised four separate Fourth Amendment suppression issues in this case, and I think it's the first time I've ever done that. I'd like to address before this court first the issue with regards to consent for the storage locker. And our argument is pretty simple, that Crystal Flores did not have apparent authority to allow officers to give written consent for officers to look at that storage locker. Why doesn't it matter? The district court, or the magistrate judge, based on the terms of the lease, also found actual authority. And I know you respond by suggesting that the officers didn't know about that at the time. But why should that? That certainly matters for apparent authority, because apparent authority depends on the representations made to the officers. But I was curious why the officer's intent matters for actual authority, which just depends on the I was curious if you'd like to comment on that. Yes, your honor. So, with regards to actual authority and the fact that she is listed on the lease for the storage unit, that does not actually mean that she has actual authority to allow the search of the premises. And the reason I say that is twofold. Number one, any number of people can be listed on that lease by the defendant in this case, whether or not they have any relation to the defendant or not. But more than that, in order to have authority, actual authority, you actually have to have the ability to have custody and control over the premises. And in this case, she never did. The evidence in this case is pretty clear that not only did she not know where the storage unit was even located, but that she couldn't even provide the name to the storage unit and she didn't have a key to the storage unit. So, regardless of whether her name exists on that lease in some fashion, that doesn't mean automatically that there is actual authority for her. I see. So, the view is actual authority doesn't depend on whether you have a legal right. It depends on whether you've actually been going to the locker and using it. Absolutely. Because you can think of a scenario where you have a wife and a husband that are going through a divorce and so the wife is still on the title to the house. But there's all these things that have happened. The locks have been changed. She's been removed through, let's say, a restraining order or something like that. The fact that her name happens to still be on the title doesn't mean that she has actual authority to provide consent. And keep in mind that this is her providing consent in this case, not just simply authority. And we've made our secondary argument, which is that any consent that was provided that night certainly wasn't a voluntary act on her part. But you would agree with that one, though. It would be a clear air standard of review. I think our case law was a bit inconsistent on this, but I think most of the cases nowadays suggest that the ultimate conclusion about whether consent was voluntary is a fact question that we review under a deferential standard. I do agree that that is the case. Yes, Your Honor. Yes. But with regards to, and I think it's pretty straightforward in terms of apparent authority, there was no apparent authority here. She didn't have a key. She didn't know where it was. And the government portrays this as some kind of a credibility determination. And as we point out in our reply brief, I can rely solely on the information that was provided by the testifying officers in this case and win this at all. So this is not a credibility issue at all. If you take a look at, for instance, page ID 233, which is a bowling's testimony. And he says, they asked what the basis was for believing that Flores had authority. Well, she had stuff in there. That's what she told us. She had stuff in there. And then you have the federal agent, Agent Evans, who also was very his response as well. She'd been there and she had stuff there and she signed the consent. And then you have the actual written report by the officers, which by the way, is contrary to some of their testimony that they provided in trial. But the written report by officers, this is on page ID 212, says that she's not sure about the storage unit. She never had access or in and not sure where it was. So all of those facts would make it so there was no apparent authority at the time and they should not have allowed her to sign the consent. But more than that, the facts of the case, it being 2.30 in the morning, her nine people coming in the door at gunpoint, her being partially unclothed, her having a young kid there with her, all of those facts lead to the fact that this was not a knowing involuntary decision on her part to sign that paper. And that kind of leads me to the second issue. Mr. Shagg, let me ask you, is there any case law? I mean, what is the guidance on this? Is there guidance on this question of someone who may have actual authority or may have signed a document that looks like it and that you look behind that to other circumstances to decide whether you should ignore or minimize the effect of what that looks like legal authority? So I actually did research on that, Your Honor. I did not find any case law. This seems to be a fairly unique set of circumstances in that regard. Okay. Could I ask you to address the Terrace Creek search in the first place, which proceeds, I guess? Yes, Your Honor. And that would preterm it if you want on the Terrace Creek search was invalid, that would cover the consent as well, I suppose. Yes, Your Honor. And that was actually where I was heading to next because as this court realizes, there were two search warrants that were issued that night at about 1230 in the morning, one for Terrace Creek and one for the Crescent Center. The affidavits in support of those search warrants were identical, virtually identical. And so the officers believe that the same evidence supports probable cause for both of them. There is simply no evidence tying any drug trafficking, in other words, evidence of any crime to the Terrace Creek apartment other than the fact that Dwayne Sheckles lived there and they believe Dwayne Sheckles to be a drug dealer. But believing someone to be a drug dealer, believing someone to have committed a crime, and knowing where they live does not give the government the authority to search a house. Can I ask you about that? Because maybe you could reconcile our cases better than I can, but I seem to have found categorical quotes pointing in opposite directions on this issue. In a case called Williams, we talked about how a recent line of cases we have that an issuing judge may infer that drug traffickers use their homes to store drugs and otherwise further their drug trafficking. I took Williams to be saying the fact that they are a drug trafficker is sufficient for the nexus requirement. But then we had a case called Brown where we said we have never held that a suspect's status as a drug dealer standing alone gives rise to a fair probability that drugs will be found in his home. And it's not clear to me that those sentences are consistent. I wonder, what's your best approach for reconciling our law on this question about whether a drug dealer's status is enough? Because I see cases going and pointing in both directions. Judge Murphy, I do agree that there is some conflict there. But as with most cases, you need to look to the facts of the particular case, which shows why the court makes in a vacuum a statement such as that. And I'll give you a great example. And that is the case that the government cited in its Rule 28J letter that it filed, I believe, a day or two ago, which is the Crawford case. Because the government makes that argument that, hey, drug dealers, if it's a drug dealer, we know that they put drugs in their home. And therefore, you can go in and get it in a search warrant for their home. But Crawford actually doesn't say that. What Crawford does is it makes kind of a quote along those lines, but then goes on to say, well, in this case, there was enough because there was a controlled buy with an or another kind of a person. And the officer saw the defendant leave his home with a bag. And then that bag was found to have contained the drugs. So we know that there were drugs that were located in the home because of the bag that we saw him leave with. And that's how we get to probable cause in that case. And I think the other thing is that some of the cases that make kind of those in the context of good faith exception and not probable cause itself. So in other words, the McCoy case that the district court relied on for that proposition, and the court used it, the lower court used it as a probable cause. But actually, McCoy isn't a probable cause case. It's whether or not the good faith saves the otherwise invalid. Does that help you here though? Because the government has raised good faith, at least in a sentence in their brief. Well, I would completely disagree that they've raised it in any fashion that would allow this court to review it. I think I've cited two different cases in my reply brief that says that if you raise an issue in a perfunctory fashion, you don't get to raise it. I would also point out that if you take a look at the district court pleadings, the government never relies on good faith at the district court level either. So they don't rely on it at the district court level. They raise it in literally one sentence at the end of this argument. This court has consistently said that when you do that, you don't get the benefit of this court's review. And so we would say that good faith isn't even on the table for purposes of- Sometimes we affirm on grounds that aren't even raised. And that's a different standard, isn't it? That's true. But in this case, even if we would get to some sort of a good faith analysis, this is so lacking in probable cause, this particular search warrant, that no reasonable officer could have relied on it. There's simply, other than the fact that- Let me ask you, Mr. Kent. Can I ask you? I am struggling with this and I don't- I think it was the Miggins case where it looked like it was just a single drug transaction and maybe a prior conviction was enough. Here, we've got the- I don't know what we do with the Mexico deal that ended up falling through, but it suggests that your client was going to be involved in a very large amount of drugs. He's a known trafficker. I think he has prior conviction. They've got the phone. I mean, why isn't that enough to make him a drug trafficker or whatever it is that would then connect him with the residence? Well, he's obviously connected with the residence because it's his residence, but- Well, I mean, the drug activity connects him with the- is connected with the residence, I guess. And that is the connection, Your Honor. It's not that a particular defendant is connected with a location. This court has said consistently that there has to be a fair probability that there's evidence of a crime at the location. And that's- in this case, actually, if you take a look at the evidence, let's take- we agree that- Can I stop you there? Can I stop you there? One theory for reconciling our cases, I thought, was perhaps it was about how big of a drug dealer the person was. So the more likely it was that it was a large drug trafficker involved in many transactions, so big time. I think Brown- the Brown case from 2016 drops a footnote suggesting this. Would you agree at least that if the drug trafficker is, you know, sort of the higher level, large transactions, that that might be enough just to satisfy this nexus requirement when the drug trafficker is like that of that situation? Your Honor, I'd actually respectfully disagree with that because what my experience is is that large scale drug traffickers tend to have- tend to not have any of their evidence in their personal home, but they use a stash house. And that's, in fact, what the government alleged in this case, right? They alleged that Crescent Center was the stash house with the money and the drugs, and it's- and that stands to reason that if the person's using a stash house, that means they're not using their personal home because they're smart enough to know that they shouldn't put that in their personal home. So that evidence actually leans the other way as to why there wouldn't be evidence in the home. And I know that my time is up. Unless there are any other questions, we would just ask that the court reverse. Okay, you'll have your full rebuttal. We'll hear from the government- from the government now. Mr. Gilbert? Yes, Your Honor. May it please the court, I'm Jay Gilbert representing the United States. Turning first to the- the Terrace Creek apartment, the- the target's phone, which was being tracked by that ping order, did ping at the Crescent- correction, at the- the Terrace Creek location. And then based upon that, officers surveilled that location and saw a car found to be Mr. Sheckle's car at that location as well. So it was not just his history as a known drug trafficker that led to that inference. But there was no drug- they didn't observe any drug activity, did they? I mean, they didn't- they didn't observe him come out of there with a duffel bag or nobody went in there to make a controlled buy. I mean, it's his house. I mean, let's- everybody can acknowledge that it's his house and his car might be parked there because he lives there. I don't- I don't see the connection, the drug activity connection with the residents. Well, Your Honor, the ping order was granted because Mr. Rivas, the dealer out of Mexico, had called that phone and that's what led to the suspicion of drug trafficking. And then- Did the warrant allow- did the warrant allow for a confiscation of the phone? If it was a smartphone, maybe it would have incriminating information on it. Your Honor, as I read the order, it allows tracking of the location of the phone. No, I meant- I meant the search warrant for terrorists- the apartment. Did the search warrant for the apartment, I assume it was drug and drug proceeds. But I suppose one theory is that if the phone was there, it might have incriminating evidence of a drug conspiracy. Your Honor, I would have to take a fresh look at that- at that warrant, which is fairly rich in detail, to see if it allowed the confiscation of the phone but that phone was in fact found at the Terrace Creek location. It does- yeah, it does say any journal, say, of their phones or address books which may contain the identities of suppliers or buyers. So I guess there was a nexus to the phone, I suppose. Yes, Your Honor, there was a nexus to the phone. The phone pinged at Terrace Creek. So I asked the other- your opposing counsel earlier about the inconsistency, what I kind of viewed as the inconsistency in our case law. How would you respond to the statement that our cases have said, we have never held that a suspect's status as a drug dealer standing alone gives rise to a fair probability that drugs will be found in his home. That strikes me as, by and large, what you were relying on here was just the statement that I just read to you, not foreclosed probable cause in this case. Well, the phone pinged at that location, Your Honor, so it wasn't just his status as a known drug dealer but also that phone, which was involved in the Rebus drug dealing calls, was located at that particular apartment. With respect, I'm just failing to see that, Mr. Gilbert. All that does is say this is his home. So if this is his home is not enough, three things that says this is his home should also not be enough. It's got to be this is his home plus something. So I don't see how it helps to say, well, we pinged him there. That means he's been there, but he lives there. We all agree he lives there. The question is whether there's anything beyond. If the quote from Judge Murphy is the law, the question is whether there's anything beyond whether it's his home. It doesn't add to that to say, yeah, it's really his home and it's really his home, does it? Your Honor, it's not just that it was his home. The cell phone did ping at that location. That means he's there with his phone on him, which we expect if he lived there, he would take his home. He would have the phone with him. I mean, he had a jacket on him, probably. How does that suggest that the home is used for these kind of activities, the fact that he had the phone in his home? That's what I'm asking. Your Honor, the ping order was to track the target phone, which was being used by. Yeah, to track him and it tracked him to his home, which you would expect if it's his home. Your Honor, it also tracked to the Crescent Hill apartment, which is where he was keeping most of the drugs. Right, so he was doing all of his drug stuff in the other place and all he did at home was home stuff like eat and watch TV, watch basketball, and have your cell phone in your his home. Well, Your Honor, contrary to what Mr. Shadd just said, drug dealers do not just use stash ounces. Okay, I understand that. I'm asking about your argument that there is more than just evidence it was his home and you use in my perception, but I'm asking to be corrected. My perception is that each of the things you cite to show that it was more than his home merely showed that it was his home. Is that question clear? Your Honor, I'm not sure I entirely understand the question. It seems to me that the fact that the target phone pinged at Terrace Creek. That just means that the phone was there. That's all it means, right? Well, using it, it just means that phone was there. Well, people carry their phones around with them when they go home. The background information regarding the ping order said that that phone was being used for drug deals, Your Honor. Let me ask you this, did you have, was there then probable cause to search any place that the phone pinged? Wherever that phone pinged, it carried probable cause with it? Well, possibly, Your Honor, given, I mean, there may be further facts, but where it pinged in this case was at Terrace Creek and at Crescent Center. And Terrace Creek was also his home, which according to the case that I cited in the 28J letter does lead to a reasonable inference. And can I ask you, do you know the facts? As I understand the facts, it pinged at Terrace Hill when his car was actually at the Crescent apartment. Is that accurate or not accurate? So when was the closest in time pinged to when the search occurred? Well, Your Honor, let me clarify the chronology of it here because it's summarized in the United States brief, which in turn refers to the transcript from the suppression hearing. The suppression hearing testimony, I think it was by Officer Olding, said that the ping order was obtained on July 6th. The following day, July 7th, it pinged at Terrace Creek Apartments. And then it was a couple of days later that the United States learned, or the DEA learned, that the 10-kilogram cocaine deal was off, but only because the Louisville dealer had spent his money on other drugs. And then somewhere in the interim, and it's unclear the chronology of this, the cell phone also pinged at Crescent Center. Okay, so then based upon all of that, the DEA, well, it was the task force, went to Crescent Center and obtained more information about what turned out to be apartment 234. There was not only the anonymous tip, but a maintenance person at Crescent Center had talked about a marijuana smell coming out of apartment 234 when they changed the furnace filter. There was a video showing two gentlemen bringing bags in and out of Crescent Center. And then the vehicle, the rental vehicle, that was determined to belong to Mr. Shekels was parked in the designated space for apartment 234. And so this is the point I was getting at. I thought there was another pinging of the phone around this time, and it turned out the phone had pinged at the Terrace Apartments when the car was actually at the Crescent Apartments. I may be mistaken on that, but that's my guess. Your Honor, I don't recall that fact. You may be correct, but I don't recall it that way. The phone ping warrant, read in its entirety, clearly was meant to go on for an ongoing investigation. The affidavit for that ping warrant talked about the history and the reason why there was a nexus between drug dealing and that target phone. The ping order was set to go in place for 60 days, indicating that it was for an ongoing investigation of not only the 10-kilogram cocaine deal, but also ongoing drug violations by either Mr. Mays, as it turned out to be, Mr. Shekels, or other individuals. And so it didn't just automatically terminate when that 10-kilogram cocaine deal went through or fell through. It was designed to go on for an ongoing investigation. Could I ask a question that deals with pinging? Yes, sir. As I understand pinging, I had a case on it, but I'm not an expert on it. As I understand pinging, it's just finding where that phone is located. He may not be on the phone when the phone pings, is that correct? That's my understanding as well, Your Honor. Right, so if he uses this phone all the time for drug deals, and then the phone is pinged at a certain grid coordinate location, there's no suggestion that at that particular time the phone is being used for a drug deal. That's correct, isn't it? That's my understanding of it. So if he took his phone into his grandmother's house to wish her happy birthday, stayed half an hour and left, his car would be there and the ping would be there, but there wouldn't be any lock. And maybe the reason for the ping warrant had to do with the fact that he used it at times, or maybe lots of times, for drug purposes. But that doesn't suggest that where it was pinged, it suggests that he was there, not somewhere else at that time. It doesn't suggest that he was using drugs at that point in time, does it? Well, Your Honor, it's not using trafficking or dealing. At any given moment, perhaps not, but under the totality of the circumstances in this case, the issuing judge had a good reason to think that there was a fair probability that the ping warrant would lead to evidence of a crime, which in fact it did here. Okay, and the other question I have is, is there a reason why you gave such short shrift to Leon in your briefs? Well, Your Honor, Leon was discussed earlier in the brief regarding the good faith exception to the exclusionary rule, and then there was a lot of detail given in the United States brief as to the content, the rich content of the warrants. And so, it seemed obvious that the officers relied on the issuing judge's probable cause determination as they were executing those warrants. And so, it seemed redundant to have said more than was said by citing Leon without going into more detail because the description of the affidavits or officers relied. So, is the argument that the cases Mr. Shadd relies on are different, is that it's different from those cases? Is that the Leon argument is just sort of a backup argument with all the same arguments as you were making with respect to whether the warrant was sufficient in the first place? Your Honor, first of all, the warrants were sufficient here under the totality. I understand that's your position. I'm asking about why you didn't argue the backup position. I'm suggesting that maybe you didn't argue it, but I don't know if this is what you're saying. Maybe you didn't argue it is because the arguments are virtually the same. They just parallel. It's just a stronger version of those arguments. Well, the Leon argument, Your Honor, says that the officers did rely on good faith on the issuing judge's probable cause determination. And so, it seems to me, Your Honor, that the United States brief did say that sufficiently by citing Leon, talking about the good faith exception, and by detailing the information that was put in the affidavit supporting the warrants. What about in the court below? Did you raise Leon in the district court? Yes, Your Honor. I'm glad you asked. In fact, that was raised below in the United States response to the motion to suppress. Okay. Go ahead. No, Your Honor. I just saw that my time was through, and I just wanted to be able to summarize in a sentence, if I may, unless the court has more questions. I don't. Okay. There was probable cause for all of these warrants, and in the alternative, the officers did rely on good faith on the issuing judge's probable cause determination, which is to receive deference on appeal. And so, the United States would request that this court affirm the district court. Okay. We've heard your argument, and now we'll hear a rebuttal from Mr. Shad. Thank you, Your Honor. I'd like to talk a little bit about the pinging warrant and the tracking warrant, since that was a discussion by my opposing counsel. So, first, I do agree that for the Terrace Creek warrant, it said that on July 7th, it pinged at Terrace Creek. That is the only information that we have, is the one ping on July 7th after the tracking warrant was issued. That's the only evidence that we have. But more than that, the tracking warrant doesn't go nearly as far as the government argues. There is not this long evidence of the phone being used on multiple occasions for drug deals or even discussion of drug deals. So, first, the court should be aware that the tracking warrant says that the phone didn't even come into existence until May 30th of 2017. So, all of the pages of evidence of the history of the Revis brothers had nothing to do with that tracking phone or with that particular phone, because it wasn't even involved in the picture. But more than that, when the government or when the officers got that tracking warrant, obviously, my client wasn't even the target. They thought that the target telephone belonged to a Mr. Mays. And so, this lengthy discussion of what occurred back before 2017 was all evidence of Mr. Mays and his communications with the Revis brothers. My client wasn't involved in any of that. So, this big historical four-page summary has nothing to do with my client. So, this phone comes into effect in May 30th of 2017. The only evidence, and this is on, if you want to take a look on page 128, it's page ID 128. So, at one point, and they have the information on Revis, he gets off the phone. And after he gets off the phone, at some point later, talks with the undercover agent and says, hey, I got this deal set up. And then they took a look at the target phone's records and say, that was about the time he had that conversation with the undercover agent. That's it. That's the only evidence that they have about the target phone being used. They had access to the target phone's cellular evidence of who it called and who it didn't call. If you take a look through that affidavit, it doesn't say that, oh, the target phone called Revis 13 times or the target phone even called Revis once. Do you think there was probable cause to seize the phone? Because the Terrace Creek warrant has a search and it includes not just illegal drugs, but any journals, say their phones or address books, which may contain the identities of suppliers or buyers. If the phone was seizable, I think there's a nexus there because there was a good chance the phone might be at the Terrace apartment. So, I do agree that once the officers are executing the warrant, that the phone and things like it are listed on there and they're going to seize them. So, I would agree with that, Your Honor. They never tried to tie the phone in that instance to Terrace Creek. Isn't the phone tied to drug activity, though? I mean, the whole idea is that's the phone they're calling to set up the Mexican deal that falls through or whatever, right? And so, that phone is, I mean, it's suspected of being involved in drug activity. It's located perhaps at Terrace Creek. Why isn't that enough of a drug activity nexus to search the home then? Well, Your Honor, the only evidence of drug trafficking activity is that 10-kilogram deal, which the government already knew had dissipated at the time that they're going about the warrants. Right. Okay. So, we know the drug deal's not going forward, but also we know that whoever, or they say or suspected that whoever it was that was going to distribute or buy those drugs found another source or found another supply. So, that person who has that phone is still involved in drug activity, right? I mean, even though the deal falls through, it's not because that person says, oh, I've had a change of heart. I'm not going to get involved in drugs anymore. So, it's, I mean, it's still relevant that there's still this drug activity going on, right? I would agree, number one, that it's relevant, Your Honor, but that's the problem with this case is this propensity. It's basically a propensity. Well, we know the drug deal fell through, but he's a drug dealer, so he must be doing something else. That's what that argument basically boils down to is we know he's still a drug dealer. Even though we don't know what he's doing, let's go ahead and execute these anyway because we know he's a drug dealer, but they didn't have the evidence that he had any active activity at that point. So, we would ask that the court reverse on all four of our suppression issues. Okay. Are there any questions? No. Okay. Great. Thank you, counsel, for your arguments. The case will be submitted.